[No. 18909–3–I.   Division One.   December 21, 1987.]

DAVID SCOTT, ET AL, *Appellants,* v. BLANCHET HIGH SCHOOL, ET AL, *Respondents.*

38

*David A. Summers,* for appellants.

*Siderius, Lonergan, Crowley & Pearson,* by *Kellis M. Hinkson,* for respondents.

REVELLE, J.*—David and Doris Scott brought suit for damages against Blanchet High School, the Catholic Archdiocese of Seattle, and Michael Mooney. The Scotts sought to recover for injuries to their daughter, Kelly, and for harm to their relationship with her allegedly arising out of sexual and romantic activities between Kelly and Mooney while he was employed as a teacher at Blanchet. On a motion for summary judgment, the trial court dismissed all of the claims against Blanchet and the Archdiocese. The Scotts appeal, contending the court erred in dismissing their claims based on (1) negligent hiring and/or supervision of Mooney, (2) negligent supervision of Kelly, (3) breach of contract, and (4) respondeat superior. We affirm.

## FACTS

Michael Mooney was hired to teach geometry at Blanchet High School in June 1983. Before hiring him, Dr. Joseph Haggerty, the Blanchet principal, contacted his previous

---

*Judge George H. Revelle is serving as a judge pro tempore of the Court of Appeals pursuant to RCW 2.06.150.

employers and found he had excellent references. Dr. Haggerty also interviewed Mooney on two occasions. During the interviews, the school's expectations for teachers, especially their support of the Catholic value system, were outlined. Dr. Haggerty made specific reference to the belief that premarital sexual behavior, whether between students and teachers or anybody, was inappropriate and grounds for dismissal. According to Dr. Haggerty, Mooney replied that was not in conflict with his values. No specific questions about Mooney's views on the subject of romantic contact between students and teachers were asked.

During Mooney's tenure, he received intensive supervision. As with other new teachers, he worked closely with the academic vice–principal as well as his department head. He was also given a "buddy" on the faculty. In addition, Mooney coached wrestling, and worked closely with the head coach, a former head coach, and the freshman coach, who was also the school chaplain. According to Dr. Haggerty, no procedures were employed to specifically determine whether he was conducting himself properly with female students, because there was nothing to indicate he needed more than ordinary supervision.

In September 1984, Kelly Scott began attending Blanchet. Kelly was 15 at the time, and entered the school as a 10th grader. Blanchet was her fourth school in as many years. Her parents had separated in 1979 and divorced in 1981. Kelly stayed with her mother and her new husband in Welches, Oregon, until October 1982. Finding it difficult to adjust to her mother's remarriage, Kelly moved to Seattle to live with her father, David Scott. Scott and his new wife, Doris, lived on a houseboat and because of space restrictions, Kelly was placed in a residential boarding school for the 1982–83 school year. David, Doris and their new baby moved from the boat to a home, and in June 1983 Kelly moved in with them. During the 1983–84 school year, Kelly attended Franklin High School.

Kelly had a difficult time adjusting to her father's new family as well. While at Blanchet, she confided in Mooney,

her geometry teacher. Both Kelly and Mooney maintain that their relationship was strictly one of counseling and friendship. Both deny any romantic or sexual relationship. According to Mooney, Kelly first approached him about her personal and family difficulties in late October 1984.

On March 5, 1985, Dr. Haggerty met with Mooney to discuss rumors regarding his relationship with Kelly. The previous day, Dr. Haggerty had been told by a Blanchet teacher that she had heard the relationship was romantic. According to the teacher, the mother of a classmate of Kelly's had heard from her daughter that Mooney was seeing Kelly outside of school. The teacher also spoke with the classmate, who said she had heard kids saying Kelly said she had slept with Mooney.

At the meeting with Dr. Haggerty, Mooney denied the truth of the rumors. Later that day, Mooney went out for drinks with another Blanchet teacher, Kevin Cox. According to Cox, Mooney said he lied to Dr. Haggerty but never mentioned what he lied about. Cox also said Mooney left to telephone a female student during the conversation to make sure their stories were straight. Mooney told Cox their stories were in line and that she had lied too, but did not say what their stories were about, who the girl was or who she had lied to. Cox later told Dr. Haggerty about his conversation with Mooney. According to Mooney, the "lie" he was referring to in his conversation with Cox was his response to Dr. Haggerty's question whether his relationship with Kelly was an average student relationship or a special friendship. Mooney had said that there was no special relationship, neglecting to tell Dr. Haggerty about his counseling.

According to David Scott, Kelly also met with Dr. Haggerty to discuss the rumors. She denied the rumors were true, but admitted she had told other students she was involved with Mooney. Kelly was subsequently suspended from school. According to both David and Doris Scott, Kelly told them a few days later that the rumors were true; she and Mooney were in love, she had been in bed with him

naked, and they had drunk champagne together. Sometime in October 1984, Kelly had told the Scotts she was seeing an older man, and that they had been in bed together, drank champagne and were in love. After hearing the March rumors, the Scotts concluded Mooney was the older man.

On March 11, Mooney was dismissed from Blanchet. According to the Scotts, Mooney met with them on March 22 and confirmed what Kelly had said about their relationship. According to Mooney, the meeting did take place, but no such confirmation was made. At the meeting, Mooney promised to stay away from Kelly until she was 18. Several days later, the Scotts received a letter from Mooney. In the letter, Mooney spoke of his love and concern for Kelly, but gave no indication that their relationship was anything more than friendship. Kelly ran away from home in early April.

### Nature of Review

A summary judgment motion under CR 56(c) can be granted only if the pleadings, affidavits, depositions, and admissions on file demonstrate there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The court must consider all facts submitted and all reasonable inferences from the facts in the light most favorable to the nonmoving party. The motion should be granted only if, from all the evidence, reasonable persons could reach but one conclusion. *Wilson v. Steinbach*, 98 Wn.2d 434, 437, 656 P.2d 1030 (1982).

The Scotts base their claims against Blanchet on alleged sexual and romantic activities between Mooney and their daughter, Kelly. They do not claim these activities took place during school hours, on school property, or with the knowledge or consent of the school. Instead, the Scotts argue it can be inferred from the evidence that the alleged sexual and romantic activities occurred "in the context" of Mooney's counseling of Kelly; since Mooney refers to his relationship with Kelly as a counseling relationship, it can

be inferred that *all* his contacts with her outside the classroom were for counseling, and thus the alleged activities must have occurred during that counseling. The inference proposed by the Scotts is the only direct connection they are able to draw between the claimed injury and Blanchet. Thus, for the purposes of summary judgment, it is essential for this court to determine whether the inference is reasonable.

The Scotts do not identify where, when or under what circumstances the counseling between Mooney and their daughter took place. They do claim, however, that the counseling was encouraged by Blanchet, noting the following passage from the school's Faculty/Staff Handbook:

> Faculty members are encouraged to make themselves available for consultation at times convenient to the students, especially immediately before and after school.

The evidence in support of the alleged activities consists almost entirely of claims by David and Doris Scott that both Kelly and Mooney admitted they had slept together naked, drank champagne, and were in love. None of the evidence indicates these incidents occurred in conjunction with Mooney's counseling or any activity under the supervision or control of the school. Mooney, for his part, states he counseled Kelly, but that they were never romantically or sexually involved.

The Scotts' inference that the alleged activities took place in the context of Mooney's counseling relies on vague evidence and leaps in logic. In addition, it depends upon the unsupported assumption that all Mooney's after–hours counseling was authorized by Blanchet. No evidence of the nature of the consultation encouraged by Blanchet, or the particulars of Mooney's counseling, was introduced. Accordingly, we find the inference proposed by the Scotts unreasonable.

### Negligent Hiring or Supervision of Employee

The Scotts base their negligent hiring and supervision claims on a school's duty to take precautions to protect

students from dangers reasonably to be anticipated, citing *Briscoe v. School Dist. 123*, 32 Wn.2d 353, 362, 201 P.2d 697 (1949). They do not, however, cite any case involving an action for negligent hiring, nor do they set forth any case recognizing a claim against a school for failing to adequately supervise a teacher. *See State v. Sammons*, 47 Wn. App. 762, 766, 737 P.2d 684 (1987).

### 1. Negligent Hiring

No published Washington case has discussed the elements of negligent hiring. According to 53 Am. Jur. 2d *Master and Servant* § 422 (1970):

> an employer may be liable to a third person for the employer's negligence in hiring or retaining a servant who is incompetent or unfit. Such negligence usually consists of hiring or retaining the employee with knowledge of his unfitness, or of failing to use reasonable care to discover it before hiring or retaining him. The theory of these decisions is that such negligence on the part of the employer is a wrong to such third person, entirely independent of the liability of the employer under the doctrine of respondeat superior. It is, of course, necessary to establish such negligence as the proximate cause of the damage to the third person, and this requires that the third person must have been injured by some negligent or other wrongful act of the employee so hired.

(Footnotes omitted.) *See also* 57 C.J.S. *Master and Servant* § 559 (1948); Restatement (Second) of Agency § 213 (1958).

Assuming the doctrine of negligent hiring applies to schools, the Scotts have not introduced any evidence to suggest Mooney had a history that would make him unfit to teach at Blanchet. Even if there were such evidence, nothing indicates Blanchet knew of it. Moreover, the hiring process employed by the school suggests it took reasonable care in hiring Mooney. Although certain specific questions identified by the Scotts were not asked, the process appears sufficient as a matter of law to discover whether an individual is fit to teach at Blanchet.

## 2. Negligent Supervision

Negligent supervision of an employee is a recognized cause of action. *See Focke v. United States,* 597 F. Supp. 1325, 1348 (D. Kan. 1982); 57 C.J.S. *Master and Servant* § 560 (1948); Restatement (Second) of Agency § 216 (1958); Restatement (Second) of Torts § 317 (1965). However, no published Washington case has addressed whether, or to what extent, a school has a duty to supervise its teachers.

▇ The duty to supervise students, *Briscoe,* can arguably be extended to imply a duty on a school to exercise ordinary care in the supervision of its teachers. Assuming such a duty, the evidence indicates Blanchet did not breach it. The expectations of the school were explained to Mooney and identified in the Faculty/Staff Handbook, and as a new teacher and coach, he did in fact receive extensive supervision. Moreover, even if some breach were found, since the inference that the alleged activities occurred during counseling is not reasonable, any tort by Mooney would be outside the scope of the school's duty.

## NEGLIGENT SUPERVISION OF STUDENT

Washington cases have recognized that schools have a duty to supervise their students. According to *McLeod v. Grant Cy. Sch. Dist. 128,* 42 Wn.2d 316, 320, 255 P.2d 360 (1953), a school has a duty "to anticipate dangers which may reasonably be anticipated, and to then take precautions to protect the pupils in its custody from such dangers."

The liability of a school is not limited to situations involving school hours, property, or curricular activities. *Sherwood v. Moxee Sch. Dist. 90,* 58 Wn.2d 351, 363 P.2d 138 (1961). Extracurricular activities under the auspices of the school also fall within a school's duty to supervise. *Carabba v. Anacortes Sch. Dist. 103,* 72 Wn.2d 939, 435 P.2d 936 (1967). At some point, however, the event is so distant in time and place that the responsibility for adequate supervision is with the parents rather than the school. *Coates v. Tacoma Sch. Dist. 10,* 55 Wn.2d 392, 399,

347 P.2d 1093 (1960). Thus, the initial question in a negligent supervision claim is whether the tort was committed within the school's scope of authority. *Rhea v. Grandview Sch. Dist. JT 116-200,* 39 Wn. App. 557, 560, 694 P.2d 666 (1985).

The Scotts do not argue Blanchet breached its duty by not providing supervision during Mooney's after hours counseling, nor do they claim the breach was due to Mooney's own negligent supervision of Kelly. Instead, they argue Blanchet breached its duty to supervise by failing to take adequate precautions at school: further monitoring of teachers, education of students, an express written prohibition, etc. By placing the breach on school property during school hours, the Scotts clearly locate the tort within the scope of Blanchet's authority. Their argument, however, presents two difficulties. First, the proximity between the breach of duty complained of and the alleged injury is so remote that it raises the possibility of finding proximate cause absent as a matter of law. *See Coates,* 55 Wn.2d at 399. Second, by placing the breach at school, the Scotts attempt to sidestep the broader implication of the scope of authority question; whether the responsibility for supervision at the time of the alleged activities had shifted away from the school. Since the inference connecting the allegations and Blanchet is unreasonable, any injury should be considered outside Blanchet's responsibility. By the Scotts' logic, a school which failed to monitor student relationships and provide adequate sex education would also be liable for teen pregnancies, regardless of the circumstances, because teen pregnancies are "within a general field of danger which should have been anticipated."

## BREACH OF CONTRACT

The Scotts argue they entered into a contract with Blanchet which contained an implied covenant that the school would provide a competent and morally fit faculty. It is uncontested that the parties did enter a contract agreement

for payment of tuition. The Scotts claim the implied covenant is suggested by the language in the school's Parent/Student Handbook.

Implied covenants are not favored in the law. *Brown v. Safeway Stores, Inc.*, 94 Wn.2d 359, 370, 617 P.2d 704 (1980). In order for courts to imply a covenant in a contract, the following requirements must be satisfied:

> (1) the implication must arise from the language used or it must be indispensable to effectuate the intention of the parties; (2) it must appear from the language used that it was so clearly within the contemplation of the parties that they deemed it unnecessary to express it; (3) implied covenants can only be justified on the grounds of legal necessity; (4) a promise can be implied only where it can be rightfully assumed that it would have been made if attention had been called to it; (5) there can be no implied covenant where the subject is completely covered by the contract.

*Fuller Mkt. Basket, Inc. v. Gillingham & Jones, Inc.*, 14 Wn. App. 128, 134, 539 P.2d 868 (1975), quoting *Cousins Inv. Co. v. Hastings Clothing Co.*, 45 Cal. App. 2d 141, 149, 113 P.2d 878 (1941).

█ The tuition contract between Blanchet and the Scotts includes a promise by the Scotts to pay tuition to the school on schedule, but contains no express reciprocal promises by Blanchet. Since the contract is for tuition, it can be fairly inferred that Blanchet promised to instruct Kelly by providing a state accredited program of education. Beyond this basic understanding, however, we cannot see any covenants not in the contract that are legally necessary. Moreover, nothing in the Parent/Student Handbook specifically refers to a promise by Blanchet to provide morally fit teachers; to find such a promise requires broad generalizations. And finally, assuming an implied covenant, since the inference connecting Blanchet and the alleged activities is unreasonable, any tort here would presumably be outside the scope of the contract.

RESPONDEAT SUPERIOR

According to the court in *Kuehn v. White,* 24 Wn. App. 274, 277, 600 P.2d 679 (1979):

A master is responsible for the servant's acts under the doctrine of respondeat superior when the servant acts within the scope of his or her employment and in furtherance of the master's business. Where a servant steps aside from the master's business in order to effect some purpose of his own, the master is not liable.

The determination of this issue relies entirely on the reasonableness of the inference discussed earlier. If it is reasonable to infer from the evidence that the alleged injuries to Kelly occurred during Mooney's school authorized counseling, then a material issue of fact exists on the claim of respondeat superior. However, since the inference is not reasonable, the alleged acts are outside the scope of Mooney's employment and no claim exists under respondeat superior as a matter of law.

The judgment of the trial court is affirmed.

SWANSON and GROSSE, JJ., concur.

Review denied by Supreme Court April 5, 1988.