[No. 15332-7-II.    Division Two.    March 8, 1994.]

RONDA CARLSEN, *Appellant,* v. THE WACKENHUT
CORPORATION, *Respondent.*

*A. Robert E. Thomson,* for appellant.

*Mark J. Dynan* and *David A. Larson, P.S.,* for respondent.

ALEXANDER, J. — Ronda Carlsen appeals an order of the Pierce County Superior Court granting summary judgment to the Wackenhut Corporation, dismissing Carlsen's claims against Wackenhut for Wackenhut's alleged negligence in hiring and supervising an employee. We reverse.

On May 10, 1989, two 16-year-old girls, Ronda Carlsen and her friend, Heather, attended a rock concert at the Tacoma Dome with some acquaintances. The concert featured a group of musicians known as "Bon Jovi". During the course of the concert, Carlsen and Heather became separated from their companions. Consequently, they sought assistance from someone in authority to "help us find our friends". Toward that end, they approached a man who they believed was a "security guard".

The man, William Futi, indicated his willingness to help the two girls. After speaking with them for a short time, he asked them if they wanted to get closer to the stage and perhaps even meet the band members. The two girls were eager to meet the entertainers, so they accompanied Futi toward the stage of the Tacoma Dome. Their route required them to go under the bleachers. Carlsen indicated that "[n]either Heather or I wanted to go under the bleachers with him but since we were together and he was a security guard, we felt reasonably comfortable in proceeding." Part way to the stage, Futi mentioned that he could only take them one at a time. After Futi took Heather to the stage and returned, he told Carlsen that they would have to travel a different way back. As Futi led Carlsen under a set

of bleachers, he threw her down and attempted to rape her. Carlsen screamed but she was not heard over the noise of the concert. Futi was eventually frightened away when the music ended and the lights came on.

Futi was charged in Pierce County Superior Court with second degree attempted rape. He later pleaded guilty to an amended charge of indecent liberties.[1]

Carlsen brought suit against the Wackenhut Corporation, the company that had employed Futi at the Tacoma Dome. She claimed that Wackenhut had been negligent in its hiring of Futi in that it knew or should have known that Futi, who had a prior conviction for robbery, was unfit for employment with Wackenhut. She also claimed that Wackenhut was negligent in its supervision of Futi and that it was liable for Futi's actions under the theory of respondeat superior.

Wackenhut moved for summary judgment of dismissal. Before the hearing on Wackenhut's motion, Wackenhut filed the affidavit of Monty L. Laughlin, the assistant manager of public service for the City of Tacoma. Laughlin, who was also "working the Bon Jovi concert" that evening, described the degree to which Futi's background was checked by Wackenhut before he was hired as what Laughlin described as a "T-shirt employee".[2] Laughlin stated:

2. William A. Futi was hired by Wackenhut Corporation on March 8, 1989. He did not indicate any other middle initial or name on his application. He worked four events (30.5) hours as a T-shirt employee prior to the Bon Jovi concert.

3. I reviewed his personnel file at the time of the incident. No derogatory comments or remarks were found in his personnel file.

4. No additional background checks were done because there was no indication that it would be necessary. Mr. Futi did not report any criminal record or work-related misconduct on his job application.

5. Because of the large number of part-time employees hired who may work only one event every two months, formal

---

[1]According to Carlsen, Futi was sentenced to serve 30 months in prison.

[2]Laughlin's affidavit does not indicate why an employee of the City of Tacoma possessed knowledge about Wackenhut's method of hiring its employees. Presumably, Laughlin had this information because the Tacoma Dome is owned by the City of Tacoma.

background checks are not done unless there is evidence of a criminal record or problems with work habits, demeanor, or personality. If there is evidence of any such problem, then additional steps are taken to investigate an applicant.

7. During the Bon Jovi concert, he failed to follow the instructions of his lead supervisor, and was absent from his post without permission. Mr. Futi abandoned his assigned post, and evaded searches that were being performed to locate him.

8. Mr. Futi left the Tacoma Dome at approximately 10:20 p.m. when he checked in his jacket and T-shirt.

Lynn Diane Lyscio, Wackenhut's lead T-shirt supervisor at the Tacoma Dome on May 10, also submitted her affidavit in which she stated:

2. I supervised the taking of tickets as well as pat-down search and metal searches. T-shirt employees are utilized to perform these searches as well as ticket takers and ushers. A majority of these employees work one event every two months.

3. Beginning at approximately 6:00 p.m., Mr. William A. Futi was under my supervision. I assigned Mr. Futi to the F Door to perform metal searches.

4. At approximately 8:30 p.m., I was instructed to stop admitting patrons through the Upper F Door. When I went to that door, I found that Mr. Futi left his assigned post at 8:30 p.m.; he was the only person absent from the post. He was absent without permission.

5. Between 9:00 and 9:15 p.m. I searched in the office and breakroom for Mr. Futi. Also, between 9:30 and 9:45 p.m. I searched again for Mr. Futi.

6. Mr. Futi left the Tacoma Dome without following established check-out procedures at approximately 10:20 p.m. Mr. Futi had been scheduled to work until approximately 11:15 p.m. Mr. Futi did not have permission to leave work early.

7. Prior to the evening of the Bon Jovi concert, Mr. Futi had been an alert employee. He did not have problems with my explaining what his duties [were], and he was willing to carry out these instructions.

8. Mr. Futi did need instruction about the duration of his assigned breaks. I clarified break procedures with Mr. Futi. Once the procedures were clarified, there were no other situations which would cause me to question his ability to do his job or anything that would require additional training.

Carlsen submitted her affidavit in response. She stated that, according to court records her attorney had obtained from King County, Futi:

has been convicted of third degree theft, criminal trespass, no valid operators license, third degree theft and he was also charged with first degree robbery but a later review of the file showed that he plead [sic] guilty to second degree robbery.

She also provided the court with documents that revealed there were arrest warrants outstanding for Futi's failure to appear in court on two traffic offenses and for first degree criminal trespass.

In addition, Carlsen also made the following observations about the applications Futi gave to Wackenhut in an effort to obtain employment:[3]

(1) First, he says that he was a college graduate on page one but only has completed 12 years of high school. This indicates some sort of untruthfulness on his part.

(2) They asked him to list all of the jobs which he had had for the last seven years. He did not list any jobs. Why would that not be an indication that he did not want to disclose his prior history and therefore had something to hide?

(3) They did not ask him for any references related to prior supervisors. They did ask him for three people who are not related to him and who are not former employees. However, by their own admission, they did not contact any of these people to see what kind of history Mr. Futi had. Presumably, one out of the three, at least, would have told the truth. They could have also asked his mother or cousin who are also listed on the application. Would all five have lied to protect Mr. Futi?

(4) They did not ask him for his addresses for the previous five or six years. Had they asked him for his addresses (or had they asked any of the references for his previous addresses) they probably would have found out that he resided in King County. Armed with that information, they could have reviewed the juvenile court records, as my attorney did, and found Mr. Futi's lengthy criminal record including his history of violence (robbery) to which he pled guilty . . ..

(5) They did not ask him where he had graduated from high school or what schools he had attended. Had they done so, they might have determined that he had lived in King County.

(6) They asked him if he was presently employed and he indicated that he was but he did not answer the question about whether The Wackenhut Corporation could contact his present employer. That certainly indicates that he has something to hide. It also indicates that he is not willing to disclose his present employer. Of course, that might be because he doesn't

---

[3]The record contains two applications by Futi for employment with Wackenhut. One is dated March 6, which is 2 days before the date he was first hired by Wackenhut. The other is dated March 11.

want his present employer to know that he is looking for another job but that seems unlikely when he is applying for a minimum wage, part-time position as a security guard and most of the work would be done at night.

The trial court granted Wackenhut's motion, and dismissed Carlsen's claims "(a) [that] Wackenhut negligently supervised its employee; and (b) that Wackenhut Corporation was negligent in its hiring practice".[4]

■ Summary judgment is reviewed by the appellate court de novo. *Mains Farm Homeowners Ass'n v. Worthington*, 121 Wn.2d 810, 813, 854 P.2d 1072 (1993). Like the trial court, the appellate court must consider all facts submitted and all reasonable inferences from the facts in the light most favorable to the nonmoving party. *Mason v. Kenyon Zero Storage*, 71 Wn. App. 5, 8-9, 856 P.2d 410 (1993). Absent a genuine issue as to any material fact, the moving party is entitled to summary judgment as a matter of law. *Condor Enters., Inc. v. Boise Cascade Corp.*, 71 Wn. App. 48, 54, 856 P.2d 713 (1993). Summary judgment is proper "only if reasonable persons could reach only one conclusion from all of the evidence." *Hansen v. Friend*, 118 Wn.2d 476, 485, 824 P.2d 483 (1992).

■ To prove negligent hiring in Washington, the plaintiff must demonstrate that (1) the employer knew or, in the exercise of ordinary care, should have known of its employee's unfitness at the time of hiring, *Peck v. Siau*, 65 Wn. App. 285, 288, 827 P.2d 1108, *review denied*, 120 Wn.2d 1005 (1992); *Guild v. St. Martin's College*, 64 Wn. App. 491, 498, 827 P.2d 286, *review denied*, 119 Wn.2d 1016 (1992); *Banks v. Nord-*

---

[4]The trial court's order on summary judgment did not dismiss Carlsen's lawsuit against Wackenhut. Neither did it indicate that there was no just reason to delay an appeal. Although Wackenhut's counsel state in its brief that Carlsen's lawsuit, insofar as it was based on respondeat superior, had been dismissed, it does not cite to the record to support that statement. Furthermore, the trial court's order belies that assertion. Therefore, we presume Carlsen's claim against Wackenhut based on respondeat superior is still pending. The order, therefore, is not appealable pursuant to RAP 2.2(d); *see also* CR 54(b); *Fox v. Sunmaster Prods., Inc.*, 115 Wn.2d 498, 798 P.2d 808 (1990); *Pepper v. King Cy.*, 61 Wn. App. 339, 810 P.2d 527 (1991). Nevertheless, we have chosen to review the trial court's order pursuant to the provisions of RAP 2.3.

*strom, Inc.*, 57 Wn. App. 251, 263, 787 P.2d 953, *review denied*, 115 Wn.2d 1008 (1990); and (2) the negligently hired employee proximately caused the resulting injuries. *Guild*, 64 Wn. App. at 498-99. Here, there is no question about the fact that Futi caused Carlsen's injuries. Thus, we will focus on the same record the trial court examined to determine whether material factual issues exist concerning whether Wackenhut knew or should have known of Futi's unfitness when it hired him.

Wackenhut asserts that, at the time it hired Futi, there were no indications in his applications that Futi was unfit for employment as a "T-shirt employee". Wackenhut stresses that it had no knowledge of Futi's criminal record, pointing to Futi's employment applications in which he indicated that he had never "been convicted for the violation of any law in a military or criminal court which has not been sealed, annulled, or deleted from the record" and had never "been dismissed, or asked to resign from employment". There is, indeed, nothing in the record to suggest that Wackenhut's employees knew of Futi's prior criminal record before Futi was hired. That fact, however, does not justify entry of summary judgment in favor of Wackenhut if a reasonable trier of fact could nonetheless conclude that Wackenhut should have known that Futi was unfit for employment.

Wackenhut cites *Peck* as support for its position that, as a matter of law, it was not negligent in hiring Futi. In *Peck*, this court determined that a trial court did not err in determining on summary judgment that a school district was not negligent in hiring a high school librarian who later wrongfully engaged in sexual relations with a student. We concluded that, because the school district had checked the librarian's teaching certificate and background when it hired him, there was no evidence that at the time of hiring the school district knew or, in the exercise of ordinary care, should have known that he was unfit for employment as a librarian. *Peck*, 65 Wn. App. at 289.

In our judgment, *Peck* is of little help to Wackenhut. Unlike the employer in *Peck*, Wackenhut did not check into Futi's background after receiving his applications. It did not, for example, contact Futi's references to determine if he had a criminal record. These failures seem particularly significant in light of the dearth of information provided by Futi and the fact that there were inconsistencies on the face of his applications. We are satisfied that a reasonable person might well infer that the lack of information provided by Futi and the inconsistencies on the applications should have alerted Wackenhut to make further inquiries. In particular, Futi indicated on both of his applications that he possessed a college degree and, yet, in a different location on one of the applications, he indicated that he had only a high school diploma. He also gave different home addresses on his two applications, although they were completed within 5 days of each other. In addition, Futi failed to state who his present and previous employers were. The latter omission, arguably, should have aroused concern because Futi was, according to his applications, 20 years of age. It seems unlikely, therefore, that this was his first employment. If it was, that fact alone would be significant.

Wackenhut's omissions stand in stark contrast with the steps taken by the employer in *Scott v. Blanchet High Sch.*, 50 Wn. App. 37, 747 P.2d 1124 (1987), *review denied*, 110 Wn.2d 1016 (1988). In that case, Division One of this court determined that a high school took reasonable steps in hiring a teacher who was subsequently accused of becoming sexually involved with a student. *Scott*, at 43. There, the employer contacted the teacher's previous employers and conducted two personal interviews with the applicant prior to hiring him. The court determined that, "[a]lthough certain specific questions . . . were not asked, the process appears sufficient as a matter of law to discover whether an individual is fit to teach". *Scott*, at 43.

Unlike *Scott*, the procedures employed here consisted solely of having the applicant answer several pages of questions on two applications. Although Wackenhut concedes

that no background check was performed before Futi was hired, it asserts that it had no duty to investigate further because Futi was merely a so-called "T-shirt" employee, not a full-fledged security guard; Futi's applications did not suggest he had any propensity for assaultive behavior, and failure to conduct a background check was not negligence per se. Carlsen responds by citing cases from two other jurisdictions to support her argument that Wackenhut had a duty to investigate Futi's background.

In *Welsh Mfg., Div. of Textron, Inc. v. Pinkerton's, Inc.*, 474 A.2d 436 (R.I. 1984), a security guard helped two others rob over $200,000 from a store he was employed to guard. The Rhode Island Supreme Court noted that, although the employer had checked the employee's criminal record prior to hiring him, it did not contact the employee's character references. *Welsh*, at 442-43. The only phone call the employer made was to a previous Navy superior who had known the security guard for only 2 months. In upholding the trial court, the Supreme Court found that the security company's "cursory investigation prior to [the security guard's] employment provided it with little current intelligence on him and could well support an inference of negligence in hiring for such a sensitive assignment as the guarding of gold." *Welsh*, at 442-43.

Similarly, in *Easley v. Apollo Detective Agency, Inc.*, 69 Ill. App. 3d 920, 387 N.E.2d 1241 (1979), an Illinois appellate court upheld a trial court decision finding a security company guilty of willful and wanton misconduct in hiring an armed security guard who used his passkey to gain entrance to an apartment and attempted to rape the occupant. The security company had not checked the security guard's prior addresses, personal references, or criminal history prior to hiring him, and the guard was not required to take any intelligence or psychological tests.

Although Futi's responsibilities were, arguably, not so great as those delegated to the employees in *Easley* or *Welsh*, in that he was not guarding valuable personal property and was not authorized to carry a weapon, Futi was, in a real sense,

responsible for protecting young concertgoers. Viewing the evidence most favorably to Carlsen, as we must, there is at least an inference that Wackenhut held Futi out as more than a mere ticket taker. According to Wackenhut's lead supervisor, as a T-shirt employee Futi was responsible for performing pat-down searches and metal searches of incoming patrons. He was also responsible for ushering patrons to their seats. More importantly, he was placed in a position where patrons could reasonably view him as an authority figure. This is manifested by Carlsen's statement that "[n]either Heather or I wanted to go under the bleachers with [Futi] but since . . . he was a security guard, we felt reasonably comfortable in proceeding."

Past Washington decisions tend to employ a type of balancing test to determine if the given employment warrants the extra burden of a thorough background check. *See, e.g., La Lone v. Smith*, 39 Wn.2d 167, 172, 234 P.2d 893 (1951) ("One may normally assume that another who offers to perform simple work is competent. If, however, the work is likely to subject third persons to serious risk of great harm, there is a special duty of investigation.") (quoting Restatement of Agency § 213, at 465 (1936); *see also Welsh*, 474 A.2d at 440 ("[t]he greater the risk of harm, the higher the degree of care necessary to constitute ordinary care").

■ Although Futi's job was not high paying, the circumstances of his employment put him in a position of responsibility. A jury might well conclude that it was reasonable for concert patrons to look upon Futi as one authorized to perform security functions, and that, therefore, Wackenhut should have more extensively examined Futi's background before hiring him. The need for such a determination by a jury seems especially compelling in light of the limited information and inconsistencies in Futi's applications for employment. This additional investigation might well have disclosed Futi's prior juvenile record.

■ Wackenhut argues, finally, that even if it had performed a check of Futi's criminal record, nothing in that record indicated a propensity for sexual violence. Carlsen responds

that robbery (only one of Futi's four convictions) involves the use of force or a threat of force which is indicative of a propensity toward violence. We agree with Carlsen that robbery is a crime of violence.[5] Upon discovery of a prior robbery conviction, a prospective employer would be on notice that the prospective employee has a propensity for violent behavior. In short, we conclude that, although Wackenhut did not have actual knowledge that Futi was potentially dangerous, a trier of fact could find that the corporation breached its duty of ordinary care by not doing more to determine whether Futi was fit to work in the job he performed for Wackenhut.

Finally, Wackenhut asks this court to award it costs and attorney fees pursuant to RAP 18 and RCW 4.28.185(5). Because of our ruling reversing summary judgment, Wackenhut cannot, at this time, be said to be a party who "prevails in the action". Wackenhut, therefore, is not entitled to costs and fees.

Reversed.

MORGAN, C.J., and SEINFELD, J., concur.

Review denied at 124 Wn.2d 1022 (1994).

---

[5]*See* RCW 9.94A.030(34) which includes second degree robbery in the definition of "violent offense".