**John DOE, Plaintiff,**

v.

**CORPORATION OF the CATHOLIC BISHOP OF YAKIMA, a nonprofit corporation; Diocese of Yakima; and Catholic Church of the Resurrection, Defendants.**

**No. CV–11–3073–EFS.**

United States District Court,
E.D. Washington.

July 30, 2013.

Bryan G. Smith, Megan E. Hale, Vito R. De La Cruz, Tamaki Law Offices, Yakima, WA, Randall Lane Vogt, Randall Vogt PC, Portland, OR, for Plaintiff.

Theron A. Buck, Stafford Frey Cooper, Thomas D. Frey, Frey Buck PS, Seattle, WA, for Defendants.

## ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

EDWARD F. SHEA, Senior District Judge.

## I. *INTRODUCTION*

A hearing was held in the above-captioned matter on June 19, 2013. Plaintiff John Doe was represented by Bryan G. Smith and Vito R. de la Cruz; Defendants Corporation of the Catholic Bishop of Yakima, Diocese of Yakima, and Catholic Church of the Resurrection (collectively, "Defendants") were represented by Thomas D. Frey. Before the Court was Defendants' Motion for Summary Judgment, ECF No. 21, in which Defendants seek summary judgment on all of Plaintiff's claims. Following the hearing, the Court took the summary judgment motion under advisement pending *in camera* review of an email subject to a contemporaneous discovery dispute between the parties. *See* Plf.'s Mot. to Compel, ECF No. 33. On July 15, 2013, the Court granted in part Plaintiff's motion to compel and ordered Defendants to disclose the disputed

email to Plaintiff. ECF No. 61. On July 24, 2013, the Court summarily denied Defendants' motion for summary judgment, indicating that a written order would follow. ECF No. 65. This Order memorializes and supplements the Court's prior ruling.[1]

## II. *BACKGROUND* [2]

In August 1998, Aaron Ramirez Lopez ("Ramirez") came from Mexico to the Yakima Diocese as a seminarian. He had previously been a member of two different religious orders in Mexico, and he had previously studied at a seminary there. On March 1, 1999, about seven months after arriving in Yakima, Ramirez asked to become a deacon candidate, and Yakima Bishop Carlos Sevilla granted his request. On May 29, 1999, Sevilla ordained Ramirez as a transitional deacon.

Reverend Bill Shaw, the pastor of the Resurrection Parish in Zillah, was responsible for supervising Ramirez's ministry activities. Through his ministry in the Parish, Ramirez met Plaintiff, a then-seventeen-year-old male parishioner. Ramirez spent time with Plaintiff outside of church and visited his home. On several occasions, Ramirez hosted underage drinking parties at a trailer on church property, a trailer which served as the rectory for the Parish and which Plaintiff understood to be Reverend Shaw's home. During these parties—at which no adults other than Ramirez were present—Ramirez supplied the underage youths with alcohol and socialized with them. Plaintiff attended several of these parties.

On July 29, 2009, Ramirez invited Plaintiff over to the rectory to drink alcohol. After others left and they were alone, Plaintiff tried to leave several times throughout the evening, but Ramirez repeatedly dissuaded him from going. Plaintiff continued to drink beer and alcohol. At some point later in the evening, he drank what he believed to be a glass of wine that Ramirez had given him. At that point, Plaintiff apparently lost consciousness; he cannot recall what happened next. He eventually regained consciousness, but could not move or resist physical advances from Ramirez. Over the course of the evening, Ramirez repeatedly raped and sexually assaulted Plaintiff. When Plaintiff finally regained his faculties, he discovered Ramirez was asleep, so he fled from the rectory and later called the police.

The next day, the Zillah Police Department investigated the rape and contacted Bishop Sevilla about Ramirez. Sevilla promptly called Ramirez, who had travelled to Wenatchee. Ramirez admitted to Sevilla that he molested Plaintiff. Sevilla informed Ramirez that he would send another priest, Father Metha, to Wenatchee the next day to collect Ramirez and take him to Zillah authorities. When Father Metha arrived the next day, he found that Ramirez had fled to Mexico.

Over the next several years, Sevilla maintained contact with Ramirez in Mexico. Sevilla never encouraged Ramirez to turn himself in; instead, he repeatedly encouraged Ramirez to find other work in the ministry. He provided Ramirez with

---

1. The Court initially denied Defendants' summary judgment motion *in toto*. ECF No. 65. However, for the reasons set forth in part IV.D, *infra*, the Court now clarifies that it denies in part and denies as moot in part Defendants' motion.

2. In ruling on the motion for summary judgment, the Court construes the facts and all reasonable inferences therefrom, as contained in the submitted affidavits, declarations, exhibits, and depositions, in the light most favorable to the nonmoving party—here, the Plaintiff. *See Leslie v. Grupo ICA*, 198 F.3d 1152, 1158 (9th Cir.1999).

financial assistance for counseling and travel, but he never asked where Ramirez was seeking work, and he never tried to contact any religious orders in Mexico to advise them of the risk Ramirez posed. Sevilla later admitted that he did not want Ramirez to be arrested.

On July 8, 2011, Plaintiff filed this suit against Defendants, in which he asserts claims of negligence, negligent infliction of emotional distress ("NIED"), and outrage. On December 10, 2012, Defendants filed the instant motion for summary judgment, seeking dismissal of all claims. ECF No. 21. Plaintiff opposes the motion. ECF No. 27.

### III. *LEGAL STANDARD*

Summary judgment is appropriate if the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Once a party has moved for summary judgment, the opposing party must point to specific facts establishing that there is a genuine issue for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the nonmoving party fails to make such a showing for any of the elements essential to its case for which it bears the burden of proof, the trial court should grant the summary judgment motion. *Id.* at 322, 106 S.Ct. 2548. "When the moving party has carried its burden of [showing that it is entitled to judgment as a matter of law], its opponent must do more than show that there is some metaphysical doubt as to material facts. In the language of [Rule 56], the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.' " *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (in-ternal citation omitted) (emphasis in original).

When considering a motion for summary judgment, the Court does not weigh the evidence or assess credibility; instead, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

### IV. *DISCUSSION*

Defendants move for summary judgment on all three of Plaintiff's claims. As to the first claim, negligence, Defendants argue that negligent hiring or supervision claims against religious organizations fail as a matter of law because the First Amendment's Free Exercise Clause bars the claims. Defendants also argue they had no actual or constructive notice of the risk Ramirez posed and therefore owed no duty to Plaintiff. Finally, Defendants assert that Plaintiff's NIED claim is duplicative of his negligence claim, and that he has no evidence to support a claim for outrage.

In response, Plaintiff withdraws his outrage claim. ECF No. 27, at 3 n. 2. Plaintiff opposes the balance of Defendants' motion, arguing that the Free Exercise Clause does not protect Defendants' secular activities like hiring and retaining employees. Plaintiff also claims that Defendants had constructive notice of the risk posed by Ramirez because they failed to properly investigate Ramirez before hiring him. Lastly, Plaintiff argues that his NIED claim is not duplicative because it arises from Bishop Sevilla's after-the-fact efforts to aid Ramirez's flight from justice, not the actual sexual assault. The Court addresses these issues in turn.

## A. Free Exercise Clause

The First Amendment's Free Exercise Clause prohibits the government from enacting any "law respecting an establishment of religion or prohibiting the free exercise thereof." U.S. Const. amend. I. Under the Free Exercise Clause, religious organizations retain the " 'power to decide for themselves, free from state interference, matters of church [governance] as well as those of faith and doctrine.' " *Hosanna–Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, — U.S. —, 132 S.Ct. 694, 704, 181 L.Ed.2d 650 (2012) (quoting *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church*, 344 U.S. 94, 116, 73 S.Ct. 143, 97 L.Ed. 120 (1952)). In short, the First Amendment requires courts to conspicuously avoid intermeddling in matters concerning religious doctrine, church practices, and questions of internal governance. *See Erdman v. Chapel Hill Presbyterian Church*, 175 Wash.2d 659, 667, 286 P.3d 357 (2012).

Over the past two decades, the Washington Supreme Court has twice addressed whether the Free Exercise Clause bars state-law negligence claims against religious organizations when such claims arise from the selection, supervision, and retention of religious leaders. *See Erdman*, 175 Wash.2d at 666–79, 286 P.3d 357; *C.J.C. v. Corp. of the Catholic Bishop of Yakima*, 138 Wash.2d 699, 720–28, 985 P.2d 262 (1999). Defendants, relying on *Erdman*, argue that Plaintiff's negligent hiring and retention claims fail because such claims violate the Free Exercise clause by intruding into the church's ecclesiastical practice of selecting its own leaders. In contrast, Plaintiff, relying on *C.J.C.*, argues that hiring and supervision of a church deacon is a secular, non-ecclesiastical act which can subject the church to negligence and other tort claims. At first blush, *Erdman* and *C.J.C.* appear to be irreconcilable, but after closer consideration, the Court is persuaded that *C.J.C.*, and not *Erdman*, controls claims such as the one Plaintiff brings here.

In *C.J.C.*, the Washington Supreme Court considered a consolidated appeal of several unrelated cases involving negligence claims brought against church entities and officials who allegedly failed to protect child sexual-abuse victims or prevent the abuse from occurring. 138 Wash.2d at 704, 985 P.2d 262. In one of the consolidated cases, a family of three young girls—the plaintiffs—and their father moved to Washington in 1969 and joined a church in which their eventual abuser, Orin Wilson, was a deacon. *Id.* at 705, 985 P.2d 262. Over the course of the next eleven years, Wilson repeatedly molested the plaintiffs. *Id.* After filing suit years later, the plaintiffs discovered that a church elder, David Schulz, received a telephone call in 1968 while volunteering at the church, during which he was told by a parishioner that Wilson had engaged in inappropriate sexual conduct with a young girl in the parish. *Id.* at 720, 985 P.2d 262. Schulz decided not to tell anyone about the parishioner's complaint or the potential risk that Wilson posed. *Id.* The trial court held as a matter of law that the church owed no duty to the plaintiffs.

On appeal, the Washington Supreme Court considered an issue of first impression: whether "churches (and other religious organizations) [are] subject to the same duties of reasonable care as would be imposed on any person or entity in selecting and supervising their workers, or protecting vulnerable persons within their custody, so as to prevent reasonably foreseeable harm." *Id.* at 722, 985 P.2d 262. In addressing this issue, the court identified and analyzed four factors: "(1) the special relationship between the [c]hurch and [Wilson]; (2) the special relationship between the [c]hurch and the plaintiffs; (3)

the alleged knowledge of the risk of harm possessed by the [c]hurch; and (4) the alleged causal connection between Wilson's position in the [c]hurch and the resulting harm." *Id.* at 724, 985 P.2d 262. Given the confluence of these four factors in the record before it, the court concluded that the trial court erred in granting the church summary judgment because "a jury could reasonably find Wilson's position in the [c]hurch was a causal factor in the resulting harm." *Id.* at 725, 985 P.2d 262.

In *Erdman,* however, the Washington Supreme Court reached the opposite conclusion about the viability of negligent hiring and supervision claims. In that case, Angela Erdman, a church elder who was employed by the church, became embroiled in a dispute with the church's senior pastor, Dr. Mark Toone. 175 Wash.2d at 660–63, 286 P.3d 357. After submitting their dispute through internal church grievances processes, the church's governing body recommended the termination of Erdman, concluding that she had violated internal church policies and "failed to follow the scriptural teaching concerning our relationships within the body of Christ." *Id.* at 664, 286 P.3d 357. Erdman subsequently filed a grievance with a higher ecclesiastical tribunal, alleging that Toone had, among other things, violated scripture and church law, and had misused church property for personal gain. *Id.* An investigative committee examined and rejected Erdman's claims, and Erdman declined to exercise her right to appeal the committee's decision. *Id.* at 664–65, 286 P.3d 357. Instead, Erdman filed suit against the church, alleging unlawful employment discrimination and negligent retention and supervision of Toone. *Id.* at 665, 286 P.3d 357.

The court rejected Erdman's negligent retention and supervision claims as a matter of law, holding that such claims intruded upon the church's First Amendment

rights to 1) "select and supervise its ministers," and 2) receive government "deference to decisions made by [the church's] ecclesiastical tribunals." *Id.* at 666, 286 P.3d 357. The court held that negligent supervision and retention claims against a church based on its selection of a minister are barred, because "[i]mposing civil liability on a church based on its retention or supervision of its clergy can influence a religious organization's decisions about who are to act as its ministers, impermissibly involving the state in religious matters." *Id.* at 670, 286 P.3d 357. The court concluded that the hiring and supervising of ministers is a quintessentially ecclesiastical act and therefore is not subject to negligence claims. *Id.* And in reaching this conclusion, the court relied on *Hosanna–Tabor,* an employment discrimination case in which the Supreme Court recognized a "the authority to select and control who will minister to the faithful—a matter strictly ecclesiastical—is the church's alone." 132 S.Ct. at 709 (internal citation and quotation marks omitted).

Turning to the instant case, the key question is whether Defendants' decision to hire Ramirez and place him into a position with unfettered access to children can give rise to a negligence claim. While *C.J.C.* expressly condones such claims and provides a four-factor formula for imposing a legal duty on a church for the negligent conduct of its ministers, *Erdman* purports to entirely bar such claims based on the Free Exercise Clause. In both *C.J.C.* and *Erdman,* the relevant portion of the court's opinion was signed (or concurred with) by only a plurality of the Washington Supreme Court's nine justices. Thus, at least in terms of controlling authority, the question of whether (and under what circumstances) a plaintiff may bring a negligent hiring/supervision claim against a church for sexual abuse committed by its employee is an unsettled question.

In resolving this question, there are several important reasons why *C.J.C.*, and not *Erdman*, guides the Court's analysis. First, *Erdman* does not and should not be understood to apply to claims based on child sexual abuse. Although *Erdman* purports to broadly prohibit negligent supervision and retention claims against religious organizations, the case was decided in the context of a narrow employment dispute—a dispute about whether the parties appropriately adhered to scripture and church cannons in their dealings with each other and with other members of the church. This context is markedly different from a child sexual abuse case where a church negligently places an unfit abuser in a position of unchecked and unsupervised power and authority over children. *Erdman* subtly acknowledges, by way of a footnote, that its holding may not apply to negligence claims in child sex abuse cases. *See Erdman*, 175 Wash.2d at 670 n. 7, 286 P.3d 357 ("[M]any of the cases addressing the important issues here involve sexual abuse. We consider them for their legal principles. We are not faced here with allegations of sexual abuse and certainly not sexual abuse of children. It is important to bear in mind that we are applying general principles and do not decide any issues involving criminal acts.").

Another reason why *Erdman* does not apply to the present dispute is that the religious doctrine and governance questions which underpinned the negligence claims in *Erdman* are absent from the child sexual abuse claims at issue here. The allegations that the plaintiff in *Erdman* brought before the church's governing body and the ecclesiastical tribunal were premised on the church's internal policies and practices, including its methods of dispute resolution. The *Erdman* court recognized that deciding the negligent supervision and retention claims in that context would cause "entanglement in church doctrine" because the court "would

have to consider [the church's] personnel decisions, the [governing body's] actions, and the [ecclesiastical tribunal's] decision . . . [which all] plainly involved consideration of church beliefs and doctrine." *Id.* at 678–79, 286 P.3d 357. In other words, there was no way for the *Erdman* court to extricate the plaintiff's negligence claims from complex questions of internal church governance.

Despite Defendants assertions to the contrary, there is no evidence that Plaintiff's negligence claim here requires the same sort of involvement in questions of faith and church governance. Defendants protest that any after-the-fact assessment of their selection and supervision of Ramirez necessarily invades protected religious activity, but the record does not support that assertion. Unlike the plaintiff in *Erdman*, Plaintiff here does not rely—either explicitly or implicitly—on religious doctrine, church practices, and questions of internal governance in asserting his negligence claim. Here, the Court—and ultimately the jury—can determine, without resorting to religious canons, whether Defendants adequately investigated Ramirez's background before placing him in a position of authority over children.

The final reason why *Erdman* does not apply to the present case is because *Hosanna–Tabor*, on which it heavily relies, does not apply in the context of this case. In barring negligent supervision and retention claims, *Erdman* repeatedly quotes *Hosanna–Tabor's* "select-and-control" language as support for its sweeping pronouncement that courts may never inquire into a church's selection and supervision of a minister. *See, e.g., Erdman*, 175 Wash.2d at 670, 676, & 678, 286 P.3d 357 (quoting *Hosanna–Tabor*, 132 S.Ct. at 709 ("the authority to **select and control** who will minister to the faithful—a matter

strictly ecclesiastical—is the church's alone") (emphasis added) (internal citation and quotation marks omitted)). But when viewed in context, *Hosanna–Tabor's* select-and-control language is not nearly as broad as the *Erdman* court declares it to be. In fact, the paragraph following that quoted language demonstrates that *Hosanna–Tabor's* holding is explicitly limited to whether a fired minister may bring an employment discrimination suit against her church employer:

> The case before us is an employment discrimination suit brought on behalf of a minister, challenging her church's decision to fire her. Today we hold only that the ministerial exception bars such a suit. *We express no view on whether the exception bars other types of suits,* including actions by employees alleging breach of contract or tortious conduct by their religious employers. There will be time enough to address the applicability of the exception to other circumstances if and when they arise.

*Hosanna–Tabor,* 132 S.Ct. at 710 (emphasis added).

Given *Hosanna–Tabor's* sharply circumscribed holding, the United States Supreme Court plainly did not intend to immunize all aspects of hiring and supervision of ministers from tort liability; if the Court had intended that result, it would have said so. Rather, as the opinion in *Hosanna–Tabor* reflects, the Court was concerned with whether courts could redress claims by former ministers who are terminated pursuant to church policies, even if that termination might otherwise offend employment-discrimination laws. To the extent that *Erdman* ascribes a broader religious exemption to *Hosanna–Tabor,* it reaches too far.

■ *C.J.C.'s* reasoning is sound. It has never been overruled, and it is more apposite to the case at hand. Accordingly, the Court concludes, consistent with *C.J.C.,*

that the Free Exercise Clause does not bar a negligence claim against Defendants for hiring Ramirez and placing him in a position of trust and authority from which he was able to sexually abuse Plaintiff.

## B. Duty Owed to Plaintiff

Defendants also assert that Plaintiff's negligence claims are barred because Plaintiff cannot demonstrate that Defendants were on notice of the risk that Ramirez posed to underage children, and that accordingly, Defendants owed no duty to Plaintiff. Relying on *C.J.C.* and other cases, Defendants contend that no Washington court has imposed liability on a church for an employee's sexual misconduct without specific evidence that the church knew of prior instances of misconduct by that employee.

But Defendants' argument overreaches. True, in the small handful of Washington negligent-supervision cases cited by Defendants, at least one church official in each case had some notice of prior sexual misconduct by the alleged tortfeasor. *See C.J.C.,* 138 Wash.2d at 725–27, 985 P.2d 262; *Does 1–9 v. Compcare, Inc.,* 52 Wash. App. 688, 694–95, 763 P.2d 1237 (1988). But neither *C.J.C.* or *Compcare* stated— or, for that matter, even implied—that actual notice of an employee's prior misconduct is a predicate to finding that the church owes a duty of care. In the lone case suggesting otherwise, *Doe v. Corp. of the President of the Church of Jesus Christ of Latter–Day Saints,* 141 Wash. App. 407, 167 P.3d 1193 (2007) ("*L.D.S.*"), the Washington Court of Appeals declined to impose liability on a church based on a stepfather's sexual abuse of his children. Although the court did note that the church had no prior knowledge of any sexual abuse by the stepfather, the court relied on the fact that the stepfather's position as a "high priest" in the church

was a relatively common honorific and did not establish a special relationship between the abuser and the church. The court also observed that the relationship between the stepfather and the victims was established outside the context of the church, and the stepfather's position did not create a special relationship between the stepfather and the victims or provide him with the means to gain access to the victims. In essence, the *L.D.S.* court concluded that no liability could be imposed on the church because the stepfather's abuse essentially had nothing to do with the church. That is not the case here.

Contrary to Defendants' assertions, no Washington court has held that actual notice of an employee's prior wrongdoing is necessary to impose a duty of care on a religious organization. In fact, *C.J.C.* strongly suggests otherwise:

> [T]he focus is not on where or when the harm occurred, but on whether the Church or its individual officials negligently caused the harm by placing its agent into association with the plaintiffs when the risk was, *or should have been, known* .... This approach is consistent with our cases recognizing a duty to prevent intentionally inflicted harm where the defendant is in a special relationship with either the tortfeasor or the victim, and where the defendant is *or should be aware of the risk.*

*C.J.C.*, 138 Wash.2d at 724, 985 P.2d 262 (emphasis added). Thus, under *C.J.C.*, a negligence claim is sufficient if a Plaintiff can show that the employer should have been aware of the risk posed by the abuser.

■ Moreover, this language in *C.J.C.* comports with the general standard for a negligent hiring claim in Washington, which requires a plaintiff to prove that "1) the employer knew *or, in the exercise of ordinary care, should have known* of its employee's unfitness at the time of the hiring, and 2) the negligently hired employee proximately caused the resulting injuries." *Carlsen v. Wackenhut Corp.*, 73 Wash.App. 247, 252–53, 868 P.2d 882 (1994) (emphasis added) (internal citations omitted). In *Carlsen*, the Washington Court of Appeals reversed a trial court's grant of summary judgment to an employer defendant after the defendant's employee, a security guard, sexually assaulted the 16–year–old plaintiff at a rock concert. *Id.* at 248–49, 868 P.2d 882. Despite inconsistencies on the face of the employee's application, the employer never contacted references or conducted a background check. *Id.* at 254, 868 P.2d 882. But because the employee was "responsible for protecting young concert goers," and because his employer held him out as an authority figure, the court concluded that "the circumstances of his employment put him in a position of responsibility." *Id.* at 256, 868 P.2d 882. The court of appeals reasoned that a "jury might well conclude that ... [the defendant] should have more extensively examined [the employee's] background before hiring him," *id.*, and that accordingly, summary judgment was improper. *Id.* at 256, 868 P.2d 882. Not only is *Carlsen* comparable to the case at bar, it recognizes the judiciousness of leaving for the fact-finder the question of whether Defendants should have been aware of the risk posed by Ramirez and whether they sufficiently inquired into Ramirez's background before placing him in a position of authority over children.

It would be irrational to require a child sexual abuse victim, who seeks to bring a negligence claim against a church, to prove that the church had actual knowledge of the risk posed by its abuser employee. In effect, it would create a disincentive for a church to investigate prospective employees before placing them in positions of trust and authority over children. Instead, churches would be motivated to en-

gage in "ostrich" behavior to avoid confronting—and thus being forced to act upon—potential warning signs about such employees. Protecting children is a paramount policy consideration, *C.J.C.*, 138 Wash.2d at 722, 985 P.2d 262, and it is ill-served if those trusted with such responsibility can blithely ignore red flags about their employees and subsequently avoid liability for the ensuing harm.

In this case, Plaintiff has raised a sufficient factual dispute as to whether Defendants were on actual or constructive notice of the risk Ramirez posed. First, based in part on deposition testimony obtained from Diocese officials, Plaintiff offers evidence that the Diocese has been aware since at least the early 1960s that some of its clergy have sexually abused children, and that specific steps needed to be taken to protect parishioners. *See* Plf.'s Stmt. of Facts ¶¶ 39–41, ECF No. 28, at 7 ("Plf.'s SOF"). Second, Defendants were indisputably aware that Ramirez had previously joined and left two separate religious orders in Mexico before coming to Yakima. Plaintiff's expert, Richard Sipe, opines that these departures alone should raise a red flag for a church about ordaining a new, relatively-unknown deacon candidate; he further opines that such facts should have been a basis for special concern, warranting further inquiry. *See* Sipe Decl. ¶ 13, ECF No. 30, at 5.

Third, although retaining educational records and recommendation letters in personnel files was a standard Diocese practice, *see* Plf.'s SOF ¶¶ 45–47, Defendants have purportedly been unable to locate these records with respect to Ramirez, *see id.* ¶ 48. When Defendants sought to laicize Ramirez in 2001, they advised church officials in Rome by letter that they had "studied with great care" the transcripts, recommendations, and records of Ramirez when he applied to the Diocese, and that "[t]he recommendations

were all extremely positive which we received from his former religious superiors, pastors[,] and friends." ECF No. 29–11. However, despite informing Rome of the existence of these records in 2001, Defendants have been unable to produce the records in this litigation, asserting that the records "simply no longer appear to exist." ECF No. 38, at 4.

Finally, the email recently disclosed to Plaintiff by Defendants—in response to the Court's Order granting Plaintiff's Motion to Compel, ECF No. 61—raises a significant factual dispute about whether and to what extent Defendants investigated Ramirez's background before placing him in a position of authority over children. On November 14, 2011, while discovery in this lawsuit was ongoing, Reverend Robert Siler, the Chancellor of the Yakima Diocese, emailed the seminary that Ramirez attended in Mexico and asked for copies of "records of priestly education" the seminary "must have" previously sent to the Diocese. ECF No. 62, at 2. Reverend Siler told the seminary that "[m]ore than ever," he needed "copies of some letters of recommendation that you had sent to us about him" in 1998 when Ramirez joined the Diocese. *Id.* at 3.

But when Father Jorge Acosta of the seminary replied several days later, he indicated that not only did the seminary have no record of receiving the Diocese's 1998 request for Ramirez's files, but that if such files had been requested, they would have contained significant red flags:

> I have consulted our archives, and I do not find any petition for information on the part of your diocese in regards to [Ramirez], and there is no proof that any letter of recommendation would have been sent on our part, given that the brother was recommended to leave our institute. His petition for renewing his vows is not admitted by the General

Council on May 16th, 1996. In our archive a petition expressed by his mentor says, "in case of attempting to enter in any other seminary, I would inform negatively."

*Id.* at 4–5.

The email from Father Acosta raises a factual issue about whether Defendants ever sought records or recommendations from the seminary about Ramirez before ordaining him. If Defendants had sought the records, this email indicates Defendants would have been on notice of problems with Ramirez, warranting further inquiry. But this email suggests that Defendants failed to follow their own, self-described standards and policies for investigating candidates for ministry. At the very least, this email creates a factual dispute about whether 1) significant, adverse information about Ramirez was available and could have been discovered by Defendants with minimal, reasonable effort, and 2) the information would have sufficiently appraised Defendants of the risk posed by Ramirez, or, at the very least, the need for further inquiry. Under any formulation, Plaintiff has raised a question of material fact about whether Defendants knew or should have known of the risk Ramirez posed. Accordingly, summary judgment on Plaintiff's negligence claim is not warranted.

## C. NIED Claim

Relying on *Francom v. Costco Wholesale Corp.*, 98 Wash.App. 845, 991 P.2d 1182 (2000), Defendants assert that Plaintiff's NIED claim is barred because he already seeks emotional distress damages through his principal negligence claim. Plaintiff contends, however, that the emotional distress damages he seeks in his NIED claim are distinct from the damages he seeks through his negligence claim. Specifically, he contends that his negligence claim covers damages arising from the actual sexual abuse, whereas the NIED claim addresses damages arising from Defendants' acts and omissions after the rape, including "aiding, abetting, or otherwise facilitating Ramirez's continued flight from justice and entry into the ministry...." ECF No. 27, at 19. Defendants offer no response to this distinction.

It is not clear from the record before the Court that Plaintiff will be able to offer sufficient evidence of damages arising from his NIED claim. But Defendants do not challenge the quantum of evidence supporting Plaintiff's purported damages; they only assert that the damages claims are duplicative. Plaintiff has sufficiently demonstrated they are not. Thus, absent further argument from Defendants about the quantum of evidence supporting such damages, the Court finds no basis at this time upon which to grant summary judgment for Defendants on Plaintiff's NIED claim.

## D. Outrage Claim

Defendants finally seek summary judgment on Plaintiff's outrage claim. In response, Plaintiff withdraws the claim. *See* ECF No. 27, at 3 n. 2. Accordingly, summary judgment on the outrage claim is moot.

## V. *CONCLUSION*

For the foregoing reasons, Defendants' Motion for Summary Judgment, **ECF No. 21,** is **DENIED AS MOOT IN PART** with respect to Plaintiff's outrage claim **AND DENIED IN PART** with respect to all of Plaintiff's other claims.

**IT IS SO ORDERED.** The Clerk's Office is directed to enter this Order and provide copies to all counsel.