# IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| | |
|---|---|
| VICKIE ELLIOTT, an individual, | No. 74137-3-I |
| Appellant, | |
| | DIVISION ONE |
| v. | |
| WASHINGTON DEPARTMENT OF CORRECTIONS, an agency of the STATE OF WASHINGTON, | UNPUBLISHED OPINION |
| Respondent. | FILED: February 29, 2016 |

SPEARMAN, C.J. — Vickie Elliott worked at a Department of Corrections (DOC) facility. One of her coworkers kicked her, attempted to kick her, and allegedly tripped her. Elliott, who is African American, argues that the offensive conduct was motivated by racial animus and that DOC failed to adequately investigate her complaint of discrimination. Because Elliott has raised genuine issues of material fact, we reverse the trial court's summary judgment dismissal of her hostile work environment, constructive discharge, retaliation, and negligent supervision claims.

## FACTS

The facts as presented on summary judgment are set forth here in the light most favorable to the nonmoving party. Becerra v. Expert Janitorial, LLC, 181 Wn.2d 186,

194, 332 P.3d 415 (2014) (citing <u>Owen v. Burlington N. & Santa Fe R.R.</u>, 153 Wn.2d 780, 787, 108 P.3d 1220 (2005).

Elliott began working as a cook at Larch Correctional Center in 2004, where she encountered several instances of race and gender-based discrimination. Between 2005 and 2009, Elliott filed six reports of incidents with coworkers in which she alleged discriminatory treatment. DOC investigated these reports, found them to be substantiated and imposed sanctions on the employees involved. Elliott filed a lawsuit against DOC in 2008. The parties entered into a settlement agreement on June 4, 2009, under whose terms Elliott released all claims for incidents occurring on or before that date.

From 2004 to 2008, Elliott had a good working relationship with her coworker, Debra Smith, who is white. The two women often laughed while they worked together and socialized outside of work on at least one occasion. A problem first arose between Elliott and Smith in the fall of 2009. Apparently, in response to a sarcastic comment, Smith kicked Elliott in the buttocks. The kick was not painful, but Elliott was deeply humiliated. Elliott viewed the kick as an offensive racial gesture. She also felt that the kick eroded the respect she had earned from inmates and made her vulnerable.

Elliott explained to Smith that kicking was degrading and recalled the way slaves were treated. Smith apologized and said she understood. Elliott reported the incident to her supervisor but asked him not to institute a formal investigation.

During the next several months, Elliott observed Smith being overly friendly with inmates. Elliott reported Smith's infractions to a supervisor four times. Smith was upset with Elliott for making these reports.

On March 9, 2010, Elliott and Smith were working in different parts of the kitchen when Elliott heard Smith speaking loudly to an inmate. Elliot went to see what was happening. Smith told Elliott to "go back to the other side of the kitchen where you belong. You go back over there where you belong. I got this." Clerk's Papers (CP) at 166. As Elliott turned to walk away, Smith said "yeah, get" and raised her foot as if to kick her. Id. Elliott viewed this second kicking incident as racist because Smith understood that Elliott viewed kicking as racially offensive. Elliott believed that Smith was also motivated by anger over Elliott's reports to supervisors.

Elliott reported the attempted kick to Superintendent Eleanor Vernell, who was new to Larch. Elliott told Vernell that the incident with Smith was yet another instance of the discrimination she had experienced at Larch. Vernell, who is African American, told Elliott that she knew how she felt. She instructed Elliott to submit a workplace violence report (WVR) and an internal discrimination complaint (IDC). Vernell contacted DOC's Workplace Diversity Programs Administrator, Harrison Allen, about the incident and referred the investigation to him. Allen, who is African American, specializes in discrimination investigations.

On March 18, Elliott received an email on her personal account sent from Smith's personal account. The email was a forward with the subject line "ASS KICKIN FROM A REAL VETERAN." CP at 406. The body of the email stated "Rules for the Non-Military[.] Make sure you read #13[.]" CP at 407. "Rule" 13 stated: "If you ever see anyone singing the national anthem IN SPANISH – KICK THEIR ASS." CP at 409. Other "rules" instructed readers to "kick" people who do not stand during the National Anthem, who burn the flag, and who refer to service members by inappropriate nicknames. Elliott

3

believed that Smith sent the email to threaten and mock her. She felt that "rule" 13 was a racist statement towards all nonwhites.

Elliott submitted the WVR and IDC a few weeks later. The IDC includes a series of check boxes to identify the basis of the complaint. Elliott checked the boxes for "race" and "color." CP at 428. Both forms require a written statement detailing the complaint. Elliott submitted the same written statement with both forms. The statement described Smith's attempted kick and the previous kick. It stated that after the first incident Elliott had told Smith that kicking was degrading and asked her never to do it again. Elliott identified a coworker, Delrico Humphries, as a witness to the incident. Allen, the DOC investigator, corresponded with Elliott, Smith, and Humphries to coordinate a date to interview them.

On May 20, Allen interviewed Elliott and Smith. There is no record that he interviewed Humphries. During her interview, Elliott related the kicking incidents and gave Allen a copy of the email. She told Allen that Smith's conduct was racist. When Allen interviewed Smith, she admitted that she told Elliott to go back to her side of the kitchen and that she made a "sweeping" motion with her foot. CP at 423. She acknowledged that Elliott had told her that kicking was disrespectful and degrading. Smith stated that her husband, with whom she shares an email account, had forwarded the email to Elliott and several other people without her knowledge.

About two months passed after the interviews before Allen filed his report on Elliott's complaints. Elliott and Smith continued to work together during this time. Smith did not harass or threaten Elliott. However, tensions remained between the two women. Smith and a coworker joked about the kicking incidents, saying "'just don't kick me.'" CP

4

at 504. Elliott tried to switch shifts with other employees so she would not have to work with Smith. Elliott reported a further instance of Smith's inappropriate contact with inmates.

Allen filed his investigation report and recommendation on July 20, 2010. He concluded that Smith should be sanctioned for kicking and attempting to kick Elliott. He stated that the email appeared to be a coincidence. Allen's report is on a form indicating that it is in response to Elliott's discrimination complaint. Allen did not file a separate report on the WVR. The report does not address Smith's motivation in kicking Elliott or Elliott's allegations of racism.

Vernell intended to terminate Smith based on her repeated boundary issues with offenders and the kicking incidents. Vernell placed Smith on administrative leave starting August 3, 2010. On August 16, Smith wrote a letter to Vernell expressing dissatisfaction with her administrative leave and the investigations. She stated that several witnesses could testify to her innocence but no one had considered their statements. Smith asserted that everyone involved with the investigation was African American and they only considered statements made by African Americans.

Vernell drafted a termination letter and submitted it to DOC for approval. The draft stated that Smith was being terminated due to the kicking incidents, the repeated instances of inappropriate interactions with inmates, and Smith's failure to recognize the seriousness of her actions. After review of agency sanctions for similar offenses, DOC recommended a ten-day suspension rather than termination. Vernell agreed to the lesser sanction.

Elliott's allegations of discrimination were not considered in determining whether termination was appropriate. One of the DOC employees who recommended suspending rather than terminating Smith stated that his recommendation might have been different if there had been a finding of discrimination. Vernell also stated that she might have imposed a more severe sanction if Smith's conduct had been discriminatory.

When Elliott learned that Smith would be returning to work, she asked Vernell to change her to the morning rather than the mid-day shift so that she and Smith would not work the same schedule. Elliott told Vernell that she was afraid of Smith and was in imminent danger. Vernell denied the request. Vernell told Elliott the Collective Bargaining Agreement (CBA) did not allow her to unilaterally change another cook's schedule in order to put Elliott on morning shift. Although in an emergency situation, management may override the CBA, Vernell did not believe Smith posed an immediate threat because the two women had worked together for months after the harassing email without further incident.

On September 28, 2010, the day before Elliott and Smith were first scheduled to work together, Elliott petitioned the district court for a temporary restraining order (TRO). Elliott submitted a statement to the court describing the kicking incidents and the email. The court issued a TRO requiring Smith to stay ten feet away from Elliott.

Elliott informed Vernell and Smith of the TRO shortly before Elliott's shift began on September 29. Vernell instructed the kitchen supervisor to devise a plan to accommodate the TRO. The kitchen supervisor instructed Elliott and Smith to stay on opposite sides of the kitchen and to communicate only through her.

Elliott began her shift by attending a staff meeting, while Smith worked in the kitchen. After the meeting, Elliott took her lunch break. Elliott stated that when she went into the kitchen to get a bowl, Smith tripped her. Elliott fell and suffered back and neck strains.

Elliott was placed on medical leave and received worker's compensation for her injuries. A day or two after the incident, Elliott again asked Vernell to change her shift. Vernell refused. Elliott did not return to work. Following a hearing on October 8, 2010, Elliott obtained a permanent restraining order directing Smith to remain 250 feet away from her. On October 12, Elliott submitted a letter of forced resignation stating that the DOC had failed to protect her from a "racially abusive and increasingly violent work environment." CP at 35, 54-55.

DOC initiated an investigation into the alleged tripping incident. Elliott did not directly participate in the investigation. She sent a statement to DOC's investigator through her attorney on November 12, 2010.

On May 3, 2011, Elliott filed suit against the DOC claiming (1) racially hostile work environment; (2) constructive discharge on account of race; (3) retaliation; (4) wrongful termination; and (5) negligent supervision. Elliott later voluntarily dismissed her wrongful termination claim. The trial court granted DOC's motion for summary judgment on all claims on September 17, 2014. Elliott appeals.

DISCUSSION

Racially hostile work environment

Elliott asserts that the trial court erred in summarily dismissing her hostile work environment claim. This court reviews a summary judgment order de novo. Scrivener v.

7

Clark College, 181 Wn.2d 439, 444, 334 P.3d 541, 545 (2014) (citing Camicia v. Howard S. Wright Constr. Co., 179 Wn.2d 684, 693, 317 P.3d 987 (2014)). Summary judgment is appropriate only where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. CR 56(c). In making this determination, we view all facts and make all reasonable inferences in favor of the nonmoving party. Scrivener, 181 Wn.2d at 444 (citing Young v. Key Pharms., Inc., 112 Wn.2d 216, 226, 770 P.2d 182 (1989)).

Washington's Law Against Discrimination (WLAD), chapter 49.60 RCW, prohibits discrimination based on race. RCW 49.60.180(3). The WLAD must be liberally construed in order to serve its purpose of eliminating and preventing discrimination in the workplace. RCW 49.60.010; RCW 49.60.020. Federal cases interpreting Title VII provide guidance in interpreting the WLAD where the provisions at issue are similar. Antonius v. King Cty., 153 Wn.2d 256, 266-67, 103 P.3d 729 (2004). Summary judgment for the employer is seldom appropriate in WLAD cases because of the difficulty of proving a discriminatory motive. Scrivener, 181 Wn.2d at 445 (citing Riehl v. Foodmaker, Inc., 152 Wn.2d 138, 144, 94 P.3d 930 (2004)).

To survive summary judgment in a claim of racially hostile work environment, a plaintiff must produce evidence from which a jury could conclude that: (1) she received unwelcome conduct (2) because of her race (3) that affected the terms or conditions of employment and that (4) the harassment is imputed to the employer. Loeffelholz v. University of Washington, 175 Wn.2d 264, 275, 285 P.3d 854 (2012) (quoting Antonius, 153 Wn.2d at 261). Because it is undisputed that Smith's conduct toward Elliott was unwelcome, the second, third, and fourth elements are at issue.

8

Elliott argues that Smith was racially motivated when she attempted to kick Elliott in March 2010 and allegedly tripped her in September 2010. To establish that harassment occurred "because of" race, the plaintiff must show that she was singled out because of her race. Glasgow v. Georgia-Pacific Corp., 103 Wn.2d 401, 406, 693 P.2d 708 (1985). A plaintiff need not present direct evidence of discriminatory animus, but must produce evidence sufficient to support an inference of racial motivation. Kahn v. Salerno, 90 Wn. App. 110, 122, 951 P.2d 321 (1998) (citing Doe v. Dep't of Transp., 85 Wn. App. 143, 149, 931 P.2d 196 (1997)). The dispositive question is whether Smith would have kicked at and tripped Elliott if Elliott had not been African American. Glasgow, 103 Wn.2d at 406.

DOC acknowledges that Smith's conduct was inappropriate but argues that Elliott has presented no evidence that Smith targeted Elliott because of her race. DOC argues that Elliott and Smith maintained a friendly working relationship for several years. Smith was not racially motivated when she first kicked Elliott, and there is no basis to infer that Smith became racially biased after Elliott explained her perception of kicking.

However, Elliott has presented evidence from which a jury could find that Smith was racially motivated. After the first kick, Elliott explained that she perceived the kicking to be racist and highly offensive. Smith stated that she understood. A jury could infer that, because Smith knew that Elliott would perceive the gesture as racial, Smith was racially motivated in attempting to kick Elliott in March 2010. Smith also told Elliott to "[g]o back to the other side of the kitchen where you belong" at the same time she attempted to kick her. CP at 430. This statement could support an inference that Smith's action was motivated by race. Further, the email, while not overtly racist, could support

9

an inference that Smith was biased against Latinos in particular and, by extension, non-whites in general.

Because the evidence, viewed in the light most favorable to Elliott, could support an inference of discrimination, we consider whether Elliott has established that the unwelcome conduct altered the terms or conditions of her employment.

The "terms or conditions" element is satisfied if the harassment is sufficiently severe and pervasive to create an abusive work environment. Glasgow, 103 Wn.2d at 406-07. "Casual, isolated, or trivial manifestations of a discriminatory environment" are not sufficient to violate the WLAD. Washington v. Boeing Co., 105 Wn. App. 1, 10, 19 P.3d 1041 (2000) (quoting Glasgow, 103 Wn.2d at 406). The severity of the harassment is evaluated in the totality of the circumstances, considering the frequency of the conduct, whether it is physically threatening or humiliating, and whether it unreasonably interferes with an employee's work. Id. (citing Sangster v. Albertson's, Inc., 99 Wn. App. 156, 163, 991 P.2d 674 (2000)). When a plaintiff has produced evidence of discriminatory conduct, it is a question of fact whether that conduct is sufficiently severe to violate the statute. Adams v. Able Building Supply, Inc., 114 Wn. App. 291, 296, 57 P.3d 280 (2002) (citing Harris v. Forklift Sys., Inc., 510 U.S. 17, 21-22, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993)).

Elliott presented undisputed evidence that Smith kicked and attempted to kick her. And viewing the evidence most favorably to Elliott, Smith sent Elliott an email that threatened further similar assaults and then tripped her, causing her to suffer physical injuries that interfered with her ability to perform her job. The harassing acts were recurrent, physically threatening, and humiliating. We conclude that Elliott satisfied her

10

burden of creating a factual issue as to whether the conduct was severe and persistent.[1]

Elliott next had the burden to show that Smith's conduct could be imputed to DOC. Discriminatory conduct by a coworker is imputable to the employer if the employer (1) "authorized, knew, or should have known of the harassment" and (2) "failed to take reasonably prompt and adequate corrective action." Glasgow, 103 Wn.2d at 407.

When an employer has taken corrective measures, the inquiry is whether the remedial action was effective in halting the current harassment and "reasonably calculated to prevent further harassment." Perry v. Costco Wholesale, Inc., 123 Wn. App. 783, 795, 98 P.3d 1264 (2004) (quoting Knabe v. Boury Corp., 114 F.3d 407, 412–13 (3d Cir.1997)). An employer's response is evaluated for reasonableness. Swenson v. Potter, 271 F.3d 1184, 1196 (9th Cir. 2001) (citing Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998)). A good faith investigation may satisfy the "prompt and adequate requirement" although it uncovers no evidence of discrimination and results in no disciplinary action. Perry, 123 Wn. App. at 794-95. On the other hand, a negligent investigation that results in an inadequate remedy is evidence of an unreasonable response. Id. at 795-96 (citing Knabe, 114 F.3d at 412-413).

---

[1] Because we conclude that Elliott met her burden regarding the "terms and conditions" element, we do not reach her argument that her prior claims of discrimination may be considered as context in Elliott's current claim. For the same reason, we do not address Elliott's argument that the trial court failed to consider the severity of harassment from the viewpoint of a reasonable African American.

Elliott argues that a jury could conclude that DOC's investigation was faulty because it did not address Elliott's allegation of discrimination. We agree.

Elliott told Vernell that Smith attempted to kick her, the gesture was racist, and the gesture was another instance of the widespread discrimination she had experienced at Larch. Elliott filed an Internal Discrimination Complaint (IDC), on which she indicated that Smith's conduct was based on Elliott's race and color. Elliott told Allen, the DOC investigator, that Smith's conduct was racist. Although Allen investigated and ostensibly responded to Elliott's discrimination complaint, his report makes no mention of Smith's motivation and draws no conclusion as to whether Smith's conduct was based on racial animus. Elliott presented evidence that Smith would likely have been subject to more severe sanctions had Allen concluded that her conduct was discriminatory. This evidence is sufficient to raise a question of fact as to whether DOC imposed an inadequate remedy based on a faulty investigation.[2]

The evidence in the record, viewed in the light most favorable to Elliott, creates genuine questions of fact on each disputed element of Elliott's hostile work environment claim. We reverse the trial court's summary dismissal of the claim.

Constructive discharge

Elliott next argues that the trial court erred in granting DOC summary judgment on her constructive discharge claim. Resignation from employment is presumed to be voluntary. Molsness v. City of Walla Walla, 84 Wn. App. 393, 398, 928 P.2d 1108 (1996) (citing Sneed v. Barna, 80 Wn. App. 843, 912 P.2d 1035 (1996)). To rebut that

---

[2] Because Elliott has met her burden in regards to imputation to the employer, we do not reach her arguments that DOC unreasonably delayed the investigation, failed to separate Elliott and Smith while the investigation was pending, and failed to address the larger pattern of discrimination within the work environment.

12

presumption and establish a prima facie claim of constructive discharge, a plaintiff must show (1) the employer deliberately made the working conditions intolerable for the employee, (2) a reasonable person would be forced to resign, (3) the employee resigned solely because of the intolerable conditions, and (4) the employee suffered damages. Campbell v. State, 129 Wn. App. 10, 23, 118 P.3d 888 (2005) (citing Allstot v. Edwards, 116 Wn. App. 424, 433, 65 P.3d 696 (2003)).

An employer acts "deliberately" if its deliberate act creates the intolerable condition, without regard to the employer's intent as to the resulting consequence. Sneed, 80 Wn. App. at 849. Working conditions are "intolerable" if they are "so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.'" Id. (quoting Stork v. International Bazaar Inc., 54 Wn. App. 274, 287, 774 P.2d 22 (1989)). Where a plaintiff produces evidence of constructive discharge, whether the conditions were intolerable is question for the trier of fact. Id.

Elliott argues that DOC deliberately made working conditions intolerable by requiring her to work the same shift as Smith in violation of the TRO which required Smith to remain at least ten feet away from Elliott. She asserts that Larch management had a practice of requiring employees who did not get along to work together until they resolved their problems or one of them quit. DOC contends that it responded to Elliott's complaints reasonably and that scheduling Elliott and Smith on the same shift did not create an intolerable condition. DOC further argues that, because Elliott did not return to work after the tripping incident, it had no opportunity to investigate the incident, take corrective action, or implement a plan to honor the permanent restraining order that

13

Elliott later obtained. It thus asserts that Elliott has not rebutted the presumption that her resignation was voluntary.

Smith kicked Elliott, attempted to kick her, and sent her a threatening email. Elliott told management she was afraid of Smith and repeatedly asked to be changed to a different shift. DOC denied Elliott's request. Whether it was intolerable to schedule Elliott and Smith together in those circumstances is a question of fact. It is also a question of fact whether DOC refused to change Elliott's shift after the tripping incident and, if so, whether this created conditions so difficult or unpleasant that a reasonable person would have felt compelled to resign. Because Elliott has raised questions of fact concerning her constructive discharge claim, summary judgment for DOC was inappropriate.

Retaliation

Elliott next argues that the trial court erred in dismissing her retaliation claim on summary judgment. Under the WLAD, it is unlawful for an employer to "discharge, expel, or otherwise discriminate against any person" because she opposes practices forbidden by the act. RCW 49.60.210(1). To establish a prima facie case for retaliation, Elliott had to show (1) she engaged in an activity protected by the WLAD; (2) DOC took adverse employment action against her; and (3) a causal link between the activity and the adverse action. Washington v. Boeing Co., 105 Wn. App. at 14 (citing Delahunty v. Cahoon, 66 Wn. App. 829, 839, 832 P.2d 1378 (1992)).

DOC argues that Elliott's retaliation claim fails as a matter of law because a coworker's actions do not support a claim of retaliation. DOC is incorrect.

14

In Brown v. Scott Paper Worldwide Co., 143 Wn.2d 349, 20 P.3d 921 (2001), our state Supreme Court considered supervisor liability under the WLAD. The Brown court noted with approval the discussion of an employer's vicarious liability for the discriminatory acts of employees in Tyson v. CIGNA Corp., 918 F. Supp. 836, 841-42 (D.N.J. 1996). Brown, 143 Wn.2d at 360 n.3. As explained in Tyson, an employer is liable for the discriminatory conduct of a non-supervisory employee to the extent the employer knows or should know of the misconduct and fails to take adequate remedial action. Tyson, 918 F. Supp. at 841-42. A majority of federal circuits uses this reasoning and hold that Title VII protects against coworker retaliation to the extent the employer "manifests indifference or unreasonableness in light of the facts that the employer knew or should have known." Hawkins v. Anheuser-Busch, Inc., 517 F.3d 321, 345-47 (6th Cir. 2008) (surveying the tests for coworker retaliation applied by the circuits and adopting the majority approach). Like the Brown court, we find this reasoning persuasive. We apply it here to Elliott's retaliation claim under the WLAD.

The next issue is whether Smith's allegedly retaliatory act is an adverse employment action that supports a claim of retaliation. Acts such as reducing an employee's workload and pay are actionable adverse employment actions. Boyd v. State, Dept. of Social and Health Services, 187 Wn. App. 1, 13, 349 P.3d 864 (2015) (citing Kirby v. City of Tacoma, 124 Wn. App. 454, 465, 98 P.3d 827 (2004)). Materially adverse employment actions, however, are not limited to demotions or terminations. Id. An action is "materially adverse" if it would dissuade "'a reasonable worker from making or supporting a charge of discrimination.'" Id. (quoting Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006)). Whether a

particular act is materially adverse must be judged from the perspective of a reasonable person in the plaintiff's position. Tyner v. State, 137 Wn. App. 545, 565, 154 P.3d 920 (2007) (citing Burlington N. & Santa Fe Ry. Co., 548 U.S. at 71).

Accepting for the purposes of summary judgment that Smith tripped Elliott in retaliation for Elliott reporting Smith's discriminatory conduct, Elliott's retaliation claim against DOC does not fail as a matter of law. DOC is liable for Smith's retaliatory act if it manifested indifference or unreasonableness in light of the facts that DOC knew or should have known. Whether DOC's response was indifferent or unreasonable is a question of fact. Whether Smith's retaliatory conduct rose to the level of being "materially adverse" is also a question of fact. Because Elliott has raised questions of fact, we reverse the trial court's summary judgment dismissal of her retaliation claim against DOC.

Negligent supervision

Finally, Elliott argues that the trial court erred in granting DOC's motion for summary judgment on her negligent supervision claims. Elliott raises negligent supervision in the alternative to her hostile work environment and constructive discharge claims.

A claim of negligent supervision is premised on a tortious or wrongful act by an unsupervised employee. Haubry v. Snow, 106 Wn. App. 666, 679, 31 P.3d 1186 (2001) (citing Scott v. Blanchet High Sch., 50 Wn. App. 37, 43, 747 P.2d 1124 (1987)). To establish a prima facie case, a plaintiff must show (1) an employee acted outside the scope of her employment; (2) the employee presented a risk of harm to other employees; (3) the employer knew or should have known of the risk; and (4) the

employer's failure to supervise was the proximate cause of injuries to other employees. Briggs v. Nova Services, 135 Wn. App. 955, 966-67, 147 P.3d 616 (2006) (citing Niece v. Elmview Group Home, 131 Wn.2d 39, 48-49, 51, 929 P.2d 420 (1997)).

The Industrial Insurance Act (IIA) bars a plaintiff from recovering under a tort theory for injuries that are compensable under the worker's compensation system. Reese v. Sears, Roebuck & Co., 107 Wn.2d 563, 571-72, 731 P.2d 497 (1987) overruled on other grounds by Phillips v. City of Seattle, 111 Wn.2d 903, 766 P.2d 1099 (1989). When a plaintiff presents evidence of an injury that is separate from those covered by the IIA, whether her injuries are distinct is a question of fact. Goodman v. Boeing, 127 Wn.2d 401, 406, 899 P.2d 1265 (1995).

Elliott acknowledges that the IIA bars her from bringing a negligent supervision claim based on the physical injuries she suffered from the alleged tripping incident. But she argues that she suffered separate and distinct injuries, not compensable under worker's compensation, as a result of Smith's actions. Appellant's reply brief at 28. Elliott contends that she suffered emotional injuries from Smith's ongoing harassment. She also argues that Smith's tripping her resulted in her constructive discharge, an injury not compensable under the IIA.

DOC argues that Elliott's negligent supervision claim is barred as a matter of law under various theories. DOC first relies on Francom v. Costco Wholesale Corp., 98 Wn. App. 845, 991 P.2d 1182 (2000), for the proposition that Elliott may not bring a duplicative claim. But Elliott's claim is not duplicative because it is asserted in the alternative.

DOC next argues that Elliott's claim is barred because a plaintiff may not assert a tort claim based on the same facts as a WLAD claim. DOC relies on Herried v. Pierce Co. Public Transp. Benefit Authority Corp., 90 Wn. App. 468, 957 P.2d 767 (1998). In Herried, a coworker lifted weights at his desk, appeared hostile, refused to move aside when he passed the plaintiff in a narrow hallway, and drove closely behind the plaintiff as she exited the parking lot. Id. at 471-72. Herried also alleged that the coworker assaulted her by intentionally bumping into her, causing physical and emotional injuries. Id. at 471. Herried received treatment for her injuries under the worker's compensation system. Id. at 472. Based on all of the coworker's offensive conduct, Herried brought claims of sexually hostile work environment and negligent supervision. Id. The trial court dismissed both claims on summary judgment. Id.

In affirming the trial court, we noted:

> part of Herried's negligent supervision claim is foreclosed by our ruling on her discrimination claims. Since Herried has not produced proof that she was the subject of gender-based discrimination, she cannot claim that Pierce Transit was negligent in supervising an employee who allegedly discriminated. What remains is an allegation of negligent supervision for Washington's non-discriminatory assault on Herried. Id. at 475.

We then considered the assault as the basis for Herried's negligent supervision claim. Id. at 476. Because the injuries Herried suffered as a result of the assault were compensable under the worker's compensation system, and separate recovery was barred by the IIA, the court affirmed the dismissal of her negligent supervision claim. Id.

Herried does not, as DOC asserts, stand for the proposition that a plaintiff may not claim in the alternative, discrimination and negligent supervision based on the same facts. Rather, the Herried court recognized that the unsupervised employee must base

a claim of negligent supervision on tortious conduct. The Herried court concluded that, while the coworker's conduct was offensive, it was not discriminatory. The rude conduct was therefore not tortious and could not form the basis for Herried's negligent supervision claim. The coworker's alleged assault, on the other hand, was tortious even if it was not discriminatory. The assault could thus form the basis for Herried's negligent supervision claim. But because Herried failed to specify what injuries she suffered as a result of the alleged negligent supervision or "cite or even mention the Industrial Insurance Act—the basis for the trial court's ruling—in her brief[ ]," we affirmed the dismissal. Id. at 476.

In the present case, Elliott alleges that Smith kicked her, attempted to kick her, and tripped her. Even if a jury finds that these acts were not discriminatory, they are tortious. Like the assault in Herried, the kicking and tripping incidents support Elliott's claim of negligent supervision.

Finally, DOC argues that claims under the WLAD and claims of negligent supervision are mutually exclusive because WLAD claims are based on conduct that occurs within the scope of employment while negligent supervision claims are based on conduct that occurs outside the scope of employment. DOC provides no support for its assertion that a plaintiff may not plead inconsistent claims. This proposition is contrary to the civil rules, which specifically permit a party to state separate claims "regardless of consistency." CR 8(e)(2).

Elliott's alternative negligent supervision claim is not barred as a matter of law. Whether Elliott suffered injuries distinct from those compensable under the IIA is a

question of fact. <u>Goodman</u>, 127 Wn.2d at 406. We reverse the trial court's summary dismissal of her negligent supervision claim.

Because we conclude that Elliott has presented sufficient evidence to establish material issues of fact as to each of her claims, we reverse and remand for further proceedings.

WE CONCUR:

Spelman, C.J.

Trickey, J

Cox, J.